Filed 12/5/23

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| STEPHANIE BELTRAN, | |
| Plaintiff and Appellant, | G062736 |
| v. | (Super. Ct. No. PSC1802081) |
| HARD ROCK HOTEL LICENSING, INC., et al., | O P I N I O N |
| Defendants and Respondents; | |
| MAXUM INDEMNITY COMPANY, | |
| Intervener. | |

Appeal from a judgment of the Superior Court of Riverside County, Kira L. Klatchko, Judge.  Affirmed in part, reversed in part, and remanded.

The Blue Law Group and Michael K. Blue for Plaintiff and Appellant.

Fox Rothschild, John J. Shaeffer and Meeghan H. Tirtasaputra for Defendants and Respondents.

Wilson, Elser, Moskowitz, Edelman & Dicker, David S. Eisen and Robert Cooper for Intervener.

\* \* \*

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for partial publication as to parts I, II A, B, G, and III.

Plaintiff Stephanie Beltran, a server, worked at the Hard Rock Hotel in Palm Springs. She alleged she was sexually harassed by her superior and sued multiple entities and individuals for workplace sexual harassment under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA),[1] among other causes of action. The trial court eventually granted summary judgment against three of the defendants. Below, we review each cause of action in turn.

As to the individual defendant, Donna Shepherd, we find no personal liability and affirm summary judgment in her favor. As to the entity defendants, we shall affirm summary adjudication in their favor as to most, but not all, of Beltran's 15 claims.

In the published portion of the opinion, we shall discuss the adoption of Government Code section 12923 and its impact on hostile work environment claims, particularly in the context of summary judgment motions. In light of this statute, we conclude that because the trial court used outdated standards to conclude no triable issue of material fact existed, summary adjudication should not have been granted as to the hostile work environment cause of action. We also discuss the deeply problematic misuse of the separate statement of material facts by all parties and how separate statements can be brought into compliance with existing law.

In the remainder of the opinion, we reverse in part and remand on Beltran's claims for failure to prevent sexual harassment under FEHA, intentional infliction of emotional distress, and for violation of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.). The judgment is affirmed as to the remaining causes of action.

---

[1] Subsequent statutory references are to the Government Code unless otherwise indicated.

# I

## FACTS

*A. The Parties*

Among other business activities, a Hard Rock entity licenses the Hard Rock brand name for the development and operation of hotels. The Hard Rock Hotel (the Hotel) at issue in this case is located in Palm Springs. Kittridge Hotels & Resorts, LLC (Kittridge), a nonparty to this action, owned the Hotel during the time period relevant to this action, between early 2014 and the end of 2018. Under an agreement with Kittridge, defendant Hard Rock Hotel Licensing, Inc. (HRH) operated the Hotel.

Defendant Palm Springs Hospitality, LLC (PSH), "provided management services to Kittridge." Except for the Hotel's executive staff, which was hired by HRH, PSH was the employer of the Hotel's employees. In its capacity as the management company, HRH "hired, trained, discharged, and otherwise managed all Hotel employees."

An individual and nonparty named Andre Carpiac was the managing member of Kittridge during the relevant period. He was also the sole member of PSH.

Defendant Juan Rivera was hired by HRH in November 2016 as the Hotel's General Manager. He was the most senior person working at the Hotel during the relevant time period.

Beltran began her employment at the Hotel in February 2017. She worked as a server in different parts of the Hotel.

From approximately July 2017 to April 2018, defendant Donna Shepherd worked as a Human Resources Consultant at the Hotel. She was designated "as an independent contractor providing onsite human resources services." As a consultant, Shepherd did not have the personal authority to hire or fire any Hotel employee.

*B. Facts Relevant to the Instant Motions*

Beltran was hired to work at the Hotel in February 2017. She worked as a server in the Hotel's nightclub and occasionally in room service. During Beltran's employment, HRH had a written policy against sexual harassment.

On or about September 4, 2017, a security supervisor named Anthony Morgan, who worked for the Hotel's security contractor, sent an e-mail to another security employee. That employee forwarded the e-mail to Shepherd. Morgan stated that Rivera had "caused several issues" during Morgan's time at the Hotel. As relevant here, he related an instance where Rivera had claimed that the child of a server named Rebecca M. (Rebecca) was Rivera's child, "implying that they had sexual relations," which had upset Rebecca. During a party, Rivera "had forcefully grabbed" Rebecca and pulled her towards him twice.

Morgan also referred to an incident between Beltran and Rivera. "During club hours, [Beltran] had c[o]me to me and said [Rivera] was grabbing her inappropriately. I watched him for the rest of the night and he continued to do so. While she was trying to work he was grabbing her, trying to dance [with] her, not letting her do her job." He added that Rivera was "under the influence during these altercations."

Shepherd began an investigation. She stated in a declaration that prior to this report, she was not aware of inappropriate behavior by Rivera. Within 24 hours of starting the investigation, she made Rivera aware of the allegations. She told him to stay away from Beltran and out of the nightclub area as much as possible. Rivera denied any inappropriate conduct.

During a meeting with Shepherd on September 6, Morgan stated that the incident where Beltran had complained to him that Rivera had "'grabbed her ass'" occurred on August 19. After Beltran had complained to him, Morgan kept an eye out and Rivera "kept grabbing her and trying to get her to dance with him." Morgan stated he had been hearing about this kind of behavior from Rivera since before he began

4

working at the Hotel.  The former security site supervisor had asked to be transferred away from the Hotel and had "stated that [Rivera] is a creep."  Rivera, Morgan said, was always "'brushing up on the girls.'"

Shepherd met with Beltran on September 8.  Her summary of this meeting was two paragraphs long.  Beltran told Shepherd about the incident Morgan had referred to.  Beltran stated she was speaking with Rivera and mentioned to him that a friend of hers had seen him outside the Hotel.  Rivera asked Beltran jokingly if she was stalking him.  When Beltran turned to move away, "he slapped her on the ass [and] she was very upset."  Later on, at her deposition, Beltran did not recall whether Rivera grabbed or slapped her, but he touched her buttocks in what she felt was a sexual manner.

According to Beltran, during this interview, Shepherd asked her if she was wearing the same clothing that she wore during the shift in question.  Shepherd's declaration stated she asked Beltran this because she noticed Beltran was wearing her club uniform although she was scheduled to work room service.  Shepherd stated she reminded Beltran of the importance of wearing the more conservative room service uniform during such shifts because room service employees entered guest rooms alone and late at night.  Beltran, however, perceived this as inappropriate and victim-shaming.

Beltran also told Shepherd that an employee named Tomika Morgan had witnessed the incident.  Later that night, Rivera had grabbed Beltran's arm when she was working.  Beltran expressed to Shepherd her belief that Rivera had been trusted with his position and should not be behaving in such a manner.  Both Beltran and Rebecca expressed to Shepherd that they were afraid of "'getting in trouble'" for speaking to her.

Tomika Morgan told Shepherd that she saw Rivera say something to Beltran that upset her.  She did not see Rivera slap Beltran's buttocks.  Tomika Morgan asked Beltran if she was okay and Beltran said yes.

On the same day, the restaurant manager, Desiree Pineda, spoke to Shepherd about another matter.  During their conversation, the manager added she had

5

received a complaint from Beltran approximately three weeks prior stating that Rivera had "'slapped her on the behind' and that she was not happy about it." The manager had also witnessed Rivera's statements about Rebecca's "child a few times in front of employees and guests." Pineda had not previously reported these issues to Shepherd.

During her investigation, Shepherd learned that Rivera was engaged in a sexual relationship with a subordinate, the Hotel's spa and gift shop manager. According to HRH's policies, such relationships were to be reported to human resources or the general manager. There is no indication that Rivera ever reported this relationship before Shepherd learned of it during her investigation.

On September 11, Shepherd wrote a report of approximately six pages summarizing her investigation and making recommendations. With respect to Beltran's allegations, the report stated: "I believe that on August 25, 2017 [Rivera] was under the influence in the club and may have had some interactions with staff that were inappropriate. I do not believe he touched them in a sexual manner. I believe the combination of Rebecca's disappointment in not being promoted and her seeing [Rivera] act in an inappropriate manner made her decide to present a complaint which was more than likely embellished. I believe it was the gossip subject in the club for two weeks because each of the reporting employees' statements were nearly identical which is unusual in a case like this. Both employees are young and present as rather immature and anxious to cause a problem for [Rivera]."[2]

---

[2] On September 12, the day after Shepherd's report was dated, Rebecca sent a written statement to Shepherd. She stated that "Rivera has phy[s]ically assaulted and verbally sexually assaulted me on several separate occasions." In March, Rivera "had told me to feel his hands, as women say he has soft hands." She laughed this off and walked away. Her "second uncomfortable encounter was a few weeks later." Rebecca was showing a picture of her son to a security guard when Rivera approached, and asserted the baby was his son. Rebecca said it was not, and Rivera repeated that the baby was his "while giving me 'the up and down eyebrows.'" Rivera repeated these statements about Rebecca's son on another occasion, "[i]nsinuating he has had some type of sexual relations with me."

6

Unlike her later declaration in support of summary judgment, Shepherd's report does *not* reflect that she asked Beltran about other instances of harassment or inappropriate conduct by Rivera. According to Beltran's deposition, Rivera's conduct was persistently inappropriate and made her uncomfortable. He would wink at her every time he walked by, which she felt was "creepy." When he greeted her, he would "reach in for a handshake, and then he . . . with his thumb . . . kind of like massage the inside of my hand and . . . pull away slowly and . . . caress it or something." He asked inappropriate questions. She did not say anything to Rivera about his conduct because she did not like to speak to him. She was scared to report his behavior for fear that she would lose her job, although she did report the incident where he grabbed her buttocks. When he did these things, it would make her feel "unnerve[ed], anxious." After her report to Shepherd, Beltran did not recall experiencing further harassment by Rivera, and he did not touch her again, although he did try to make conversation with her. But to Beltran, the fact that Rivera was still at the Hotel was itself a problem.

As relevant to Beltran, Shepherd's report recommended that: the Hotel "re-commit" to the Hotel's drug and alcohol policies; conduct meeting with Rivera, Beltran, and herself where Rivera could "apologize if his actions were offensive to Stephanie"; "[i]ssue [Rivera] a warning notice about maintaining professionalism in the workplace and following the Alcohol and Drug policy"; and have Rivera "lead a discussion" about "tightening up our overall professionalism in the workplace."

Shepherd sent the report to Monica Marcus, a corporate human resource representative. Marcus visited the property herself and spoke to several employees, but Beltran refused to meet with her. Marcus concluded that the allegations of inappropriate touching by Rivera were "not substantiated."

It was Shepherd's understanding that any decision about Rivera's future would be made by Andrea Melotti, Rivera's boss and a corporate vice president. Melotti was also aware of the complaints against Rivera and the investigation.

7

Shepherd conducted the meeting she had recommended with Beltran and Rivera. Beltran testified at her deposition that she did not want to meet with Rivera, and she recalled Rivera apologizing, but remembered little else about the meeting. Shepherd stated the meeting with Beltran and Rivera was "very short," just two to three minutes long, and the office door remained open throughout. She had no intent to keep Beltran against her will, and had she walked out, Shepherd would not have stopped her. Beltran did not testify that she tried to leave and was prevented from doing so.

On September 19, Pineda, the restaurant manager and Beltran's supervisor, sent Shepherd an e-mail about Rivera's conduct and the investigation. Pineda restated the harassment allegations against Rivera and was critical of the investigation that had already been concluded. She wrote: "These are serious charges of misconduct and do not appear to have been handled with the sincerity warranted under the circumstances. Per company guidelines there is a zero-tolerance policy for workplace sexual harassment and any such misconduct is supposed to result in immediate termination of the offending party. Nonetheless, it has come to my attention that despite Mr. Rivera's admission of the aforementioned misconduct, no negative action has been taken against him – not only did he retain his position, he continued serving as the manager on duty even while the investigation was pending." Pineda also opined that company guidelines regarding investigations of workplace harassment had been violated by revealing the identity of the complainants to Rivera. Further, the meeting between Rivera and Beltran for Rivera's "apology" was also inappropriate. She requested further investigation.

Shepherd forwarded Pineda's complaint to Marcus, noting that Rivera had "admitted to making [Beltran] feel uncomfortable, not slapping her on the rear."

Rivera was suspended on September 21 and ultimately terminated on September 28, 2017. According to Melotti, Rivera was terminated because "there were facts that [Rivera] had admitted to . . . drinking and coming to the property intoxicated

8

and keeping the club open after hours, that were clearly a violation of our policies, and that's the reason why he was immediately terminated."

Beltran was still employed at the Hotel when Rivera was terminated. She stated in her deposition that she nonetheless did not feel comfortable working there, because she "didn't trust HR, so [if] I did have a problem, because if something else had happened, I wouldn't know who to go to." She left the Hotel in November 2017 for other employment at a different hotel.

In her deposition, Shepherd testified that she did not think any of the witnesses (which would include Morgan, Beltran, and Rebecca) were not credible. She testified she thought Beltran was credible, and she did not think she had lied about anything Beltran had shared with her, including her statement that Rivera had touched her buttocks. Shepherd also did not think Beltran was exaggerating about any of her allegations. These statements were rather inconsistent with some of the statements in her written report, particularly that she did not believe Rivera touched Beltran in a sexual manner and that both Beltran and Rebecca "were young and present as rather immature and anxious to cause a problem for [Rivera]."

C. Procedural History

The operative complaint is Beltran's third amended complaint (the complaint). Rivera was named as a defendant in the complaint, but he did not file a motion for summary judgment.

Beltran alleged 15 claims: 1) sexual battery against Rivera, Shepherd, PSH, and HRH;[3] 2) battery against Rivera, PSH, and HRH; 3) assault against Rivera, PSH, and HRH; 4) failure to prevent harassment, discrimination, or retaliation against Rivera, PSH, and HRH; 5) hostile work environment harassment against Rivera, PSH,

_____

[3] This claim was dismissed on demurrer as to Shepherd.

HRH, and Shepherd; 6) negligent hiring, retention, and supervision against PSH, HRH, and Shepherd; 7) Labor Code section 98.6 retaliation against PSH, and HRH; 8) gender discrimination against PSH, and HRH; 9) intentional infliction of emotional distress against Rivera, PSH, HRH, and Shepherd; 10) negligence against Rivera, PSH, HRH, and Shepherd; 11) UCL violations against Rivera, PSH, HRH, and Shepherd; 12) constructive discharge against PSH, and HRH; 13) Labor Code section 1102.5 retaliation against PSH, and HRH; 14) FEHA retaliation against PSH, and HRH; and 15) false imprisonment against Rivera, PSH, HRH, and Shepherd.

HRH, PSH, and Shepherd (collectively defendants) each filed separate motions for summary judgment and/or adjudication (summary judgment) and joined in each other's motions. The trial court granted all three motions. Beltran now appeals.

II

DISCUSSION

A. *The Separate Statements of Material Fact*

Defendants filed three separate statements of undisputed material facts (separate statement or statements) in support of each of the three motions for summary judgment filed in this case. Each separate statement includes over 600 paragraphs of purportedly "material facts" and runs over 100 pages. After reviewing the Defendants' separate statements and Beltran's responses to them, as well as recent separate statements in other recent cases before us, we can only conclude that a document that was intended to be helpful to the court and provide due process to the parties (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1210) is, in many cases, no longer serving either purpose. We write on this issue to remind both litigants and trial courts about the appropriate scope of the separate statement.

Code of Civil Procedure section 437c, subdivision (b)(1), requires each motion for summary judgment to be accompanied by a separate statement "setting forth

10

plainly and concisely all *material facts* that the moving party contends are undisputed. Each of the material facts stated shall be followed by a reference to the supporting evidence." (Italics added.) California Rules of Court, rule 3.1350(d)(2)[4] states: "The separate statement should include only material facts and not any facts that are not pertinent to the disposition of the motion." Under the Rules of Court, "'Material facts' are facts that relate to the cause of action, claim for damages, issue of duty, or affirmative defense that is the subject of the motion and that could make a difference in the disposition of the motion." (Rule 3.1350(a)(2).)

What neither the rule nor the statute states is that the moving party must include in the separate statement *every* fact they intend to include in their motion, regardless of its materiality. For example, HRH's very first "material fact" in its separate statement is: "The Hard Rock brand is known worldwide for its connection to music, fashion, and entertainment." Under no interpretation of "material" does this qualify – it is merely background information that has no relevance to any cause of action or defense.

This is far from the only paragraph in the three separate statements that make absolutely no difference in the disposition of the motion. *The paragraphs in a separate statement should be limited to facts that address the elements of a cause of action or an affirmative defense.* (See Code Civ. Proc., § 437c, subd. (b)(1); rule 3.1350(a)(2), (d)(2).) The statute and Rules of Court do not preclude litigants from including background, nonmaterial information in their papers as long as they include a cite to the evidence, but nonmaterial facts should not be included in the separate statement. The point of the separate statement is not to craft a narrative, but to be a concise list of the material facts and the evidence that supports them. "The separate statement serves two important functions in a summary judgment proceeding: It notifies the parties which material facts are at issue, and it provides a convenient and expeditious

---

[4] Subsequent rule references are to the California Rules of Court.

vehicle permitting the trial court to hone in on the truly disputed facts." (*Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 74.) There is nothing convenient or expeditious about the separate statements submitted in this case.

The duty to comply with the law regarding separate statements applies to both sides of a motion for summary judgment or adjudication. The opposing party's responses to the separate statement must be in good faith, responsive, and material. Responses should directly address the fact stated, and if that fact is not in dispute, the opposing party must so admit. It is completely unhelpful to evade the stated fact in an attempt to create a dispute where none exists. For example, HRH's separate statement included paragraph 14: "When Shepherd began working at the Hotel, Plaintiff Stephanie Beltran ("Plaintiff") worked as a server in different parts of the Hotel, but primarily in the Hotel's nightclub called the 'Club.'" Beltran claimed this benign and indisputable fact was disputed: "**Disputed**. Although Plaintiff was already working at Hard Rock when Defendant Shepherd was hired, Plaintiff's hire date was on or around February 10, 2017, as that's when her Labor Code § 2810.5 Notice was filled out." This response did not, in fact, dispute HRH's statement, and the response should have been "undisputed." If Beltran's hire date was a material fact (and we do not see why it was – at best, it was background information) it should be listed under the opposing party's additional facts with supporting evidence. The quoted paragraph is far from the only example of this problem in Beltran's responses.

As we mentioned, one of the purposes of the Separate Statement is "to permit the trial court to focus on whether [the material] facts are truly undisputed." (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.*, *supra*, 133 Cal.App.4th at p. 1210.) This can only be accomplished by both parties preparing the Separate Statement according to the statute and Rules of Court and acting in good faith. The moving party must include only *material* statements of fact, not incidental and background facts. The opposing party must concede facts that are truly undisputed and

only add facts that are material. It is difficult to conceive of a properly drafted Separate Statement that includes over 600 paragraphs of undisputed material facts.

Trial courts[5] should not hesitate to deny summary judgment motions when the moving party fails to draft a compliant separate statement – and an inappropriate separate statement includes an overly long document that includes multiple nonmaterial facts in violation of the Rules of Court. Courts should also not hesitate to disregard attempts to game the system by the opposing party claiming facts are "disputed" when the uncontroverted evidence clearly shows otherwise.

## B. Summary Judgment Framework and Standard of Review

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To prevail on the motion, a defendant must demonstrate the plaintiff's cause of action has no merit. This requirement can be satisfied by showing either one or more elements of the cause of action cannot be established or that a complete defense exists. (Code Civ. Proc., § 437c, subds. (o), (p); *Bardin v. Lockheed Aeronautical Systems Co.* (1999) 70 Cal.App.4th 494, 499-500.)

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield*

---

[5] In certain instances, particularly before granting summary judgment or adjudication, an opportunity to correct deficiencies in the separate statement may be appropriate. (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.*, *supra*, 133 Cal.App.4th at pp. 1215-1216; see *Rush v. White Corp.* (2017) 13 Cal.App.5th 1086, 1100.)

*Co.* (2001) 25 Cal.4th 826, 850-851.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Ibid*.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 850; see *Catholic Healthcare West v. California Ins. Guarantee Assn.* (2009) 178 Cal.App.4th 15, 23.)

In performing our de novo review, we use the same procedure as the trial court. We first consider the pleadings to determine the elements of each cause of action. Then we review the motion to determine if it establishes facts, supported by admissible evidence, to justify judgment in favor of the moving party. Assuming this burden is met, we then look to the opposition and "decide whether the opposing party has demonstrated the existence of a triable, material fact issue." (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438.) We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.)

## C. *Shepherd's Personal Liability*

Shepherd, who was ostensibly an independent contractor and consultant, was named in Beltran's causes of action for hostile work environment sexual harassment, negligent hiring, retention, and supervision intentional infliction of emotional distress, negligence, violation of the UCL, and false imprisonment.

We agree with the trial court that the evidence did not create a triable issue of fact as to Shepherd's personal liability on any of these claims, including sexual harassment. Shepherd did not personally sexually harass Beltran, nor does Beltran claim otherwise. Beltran claims that Shepherd "substantially and grotesquely added to Rivera's sexual harassment" through statements and actions taken in her investigation, but even assuming that is factually true, Beltran cites no authority for the proposition that actions

14

taken or comments made in an investigation of sexual harassment create *personal* liability for sexual harassment for a coworker or a third party consultant or contractor. Shepherd is not personally liable for sexual harassment as a matter of law.

Most of the remaining claims against Shepherd can be disposed of readily. Beltran offers no authority for the argument that an employee or outside consultant can be held personally liable for negligent hiring, retention, or supervision. Employers can only be held liable on this basis when the employer knew or should of known of the particular risk. (*Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038, 1054.) Shepherd was not Rivera's employer, and therefore this claim against Shepherd fails as a matter of law.

With respect to intentional infliction of emotional distress, such a claim is only tenable when the plaintiff can establish "'(1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.'" (*Huntingdon Life Sciences v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1259.) "'Conduct, to be "'outrageous'" must be so extreme as to exceed all bounds of that usually tolerated in a civilized society.'" (*Ibid.*) Even assuming every piece of evidence is viewed in Beltran's favor, she fails to establish that any act committed by Shepherd amounted to "outrageous" conduct as a matter of law. Nothing in her investigation or conduct comes anywhere close to meeting this high standard. Further, she has not raised a triable issue of fact that Shepherd harbored the intent to cause her emotional distress or acted with reckless disregard.

Beltran's claim for negligence also must fail as a matter of law. "The elements of a cause of action for negligence are duty, breach, causation, and damages." (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 529.) Beltran fails to establish that Shepherd personally owed any duty to her.

15

The cause of action under the UCL is derivative of Beltran's other claims, particularly the sexual harassment claim, and must therefore also fail. None of the acts alleged were committed by Shepherd personally, nor can they be imputed to her as a matter of law. No triable issues of fact exist.

That leaves Beltran's claim for false imprisonment against Shepherd, which is based on the meeting in her office between Beltran, Shepherd, and Rivera, during which Rivera stood in the door and apologized. The meeting lasted no more than two to three minutes. Beltran rather dramatically argues she was placed in a "choking triangle" between Shepherd and Rivera, but this hyperbolic claim is unhelpful.

A claim for false imprisonment requires nonconsensual confinement by the defendant with the intent to confine, without lawful privilege to do so, for an appreciable length of time. (*Scofield v. Critical Air Medicine, Inc*. (1996) 45 Cal.App.4th 990, 1001.) Even assuming that Beltran was frightened and uncomfortable during this meeting, and expressed to Shepherd that she did not wish to be in the same room as Rivera, this does not establish that Shepherd *intended* to unreasonably and criminally confine Beltran. (*Fermino v. Fedco, Inc*. (1994) 7 Cal.4th 701, 716.) Beltran stated at her deposition that she did not remember anything else about the meeting other than not wanting to be present and Rivera's apology. She did not testify that she tried to leave and was prevented from doing so, or asked to leave and was refused. Shepherd stated the meeting was "very short," just two to three minutes long. Taking these facts together, we find Beltran has not established any triable issues of fact with respect to her claim for false imprisonment.

In sum, we agree with the trial court that the evidence did not create any triable issues of fact as to any of Beltran's claims against Shepherd personally. Summary judgment, therefore, was appropriately granted to Shepherd.

16

*D. PSH's Potential Liability*

Maxum Indemnity Company submitted, as intervener, a brief on behalf of PSH, but for the sake of simplicity, we shall refer to PSH. In addition to joining in the other defendants' substantive arguments, PSH also asserts that it is not liable for Rivera's actions because HRH was Rivera's employer, not PSH. But it is uncontroverted that PSH was *Beltran's* employer, and she argues that PSH owed her a nondelegable duty to be free of harassment and misconduct in the workplace.

PSH contends Beltran's arguments on this point are not sufficiently developed, and while that might give this court the discretion to deem them waived, it also gives us the discretion to consider them on the merits. But neither party has adequately briefed this issue on appeal. PSH offers only one sentence on the merits, asserting the case Beltran cites (*SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590), discussed physical injury, and therefore "that case does not address whether this doctrine applies in this situation." While true, this is a weak legal argument that does not offer any reason why the doctrine should not apply here, but the same is true for Beltran's argument. Neither party offers a well-developed argument as to why the nondelegable duty doctrine should or should not be extended to this factual situation as a matter of law. Accordingly, we decline to consider it.

The need for an extended legal argument as to Beltran's agency theory, however, is not needed. The law of agency is well-developed and no extension or novel application of the law is at issue here. "[A] principal who personally engages in no misconduct may be vicariously liable for the tortious act committed by an agent within the course and scope of the agency." (*Peredia v. HR Mobile Services, Inc.* (2018) 25 Cal.App.5th 680, 691-692.)

PSH asserts it is undisputed that Kittridge, not HRH, contracted with PSH to manage the Hotel, and therefore PSH cannot be held liable for HRH's actions under an agency theory. But this ignores, among other things, the strong unity of interest between

Kittridge, of which Carpiac was the managing member, and PSH, of which Carpiac was the sole managing member. Carpiac acknowledged this strong unity of interest by referring to "Kittridge/PSH" as interchangeable entities. At a minimum, there is a triable issue of fact as to agency or ostensible agency between PSH and HRH. Obviously, if Beltran wishes to keep PSH in the case, she will have the burden to prove an agency relationship at trial, and she will need more evidence than is present here. But summary judgment could not have been granted to PSH on this basis. Further, summary adjudication of each cause of action was not appropriate to PSH unless it was also appropriate as to HRH.

### E. First Through Third Causes of Action -- Sexual Battery, Battery, and Assault

These claims are Beltran's first three causes of action, and the trial court granted defendants' motions for summary adjudication on all three, finding no vicarious liability for Rivera's actions. Beltran's opening brief offers no separate argument as to these causes of action. The only possible mention is a two-paragraph argument purportedly applicable to "all causes of action" asserting that the court's orders did not mention how defendants met their burden.

We disagree that the trial court's orders were inadequate. With respect to the first three causes of action, the court's order analyzed defendants' vicarious liability, finding no liability as a matter of law. Beltran's opening brief fails to provide her own analysis or to contest this. Although she does offer a two-page argument on these causes of action in her reply brief, we decline to consider it. (*Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 108.) Absent a showing of good cause, which Beltran does not offer, raising a new argument for the first time in a reply brief is unfair to the other party. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) Beltran's argument on these claims is forfeited. Accordingly, we affirm the trial court's grant of summary adjudication on the first three causes of action.

*F.  Fourth Cause of Action - Failure to Prevent Harassment, Discrimination, or Retaliation*

It is an unlawful employment practice "[f]or an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."  (§ 12940, subd. (k).)

"'When a plaintiff seeks to recover damages based on a claim of failure to prevent . . . harassment . . . she must show three essential elements:  1) plaintiff was subjected to . . . harassment . . .; 2) defendant failed to take *all reasonable steps* to prevent . . . harassment . . .; and 3) this failure caused plaintiff to suffer injury, damage, loss or harm.'"  (*Caldera v. Department of Corrections and Rehabilitation* (2018) 25 Cal.App.5th 31, 43-44.)

The trial court granted summary adjudication on this claim for two reasons.  First, Beltran testified that after the incident at the club, no further harassment took place.  "'Once an employer is informed of the sexual harassment, the employer must take adequate remedial measures.  The measures need to include immediate corrective action that is reasonably calculated to (1) end the current harassment and (2) to deter future harassment.  [Citation.]  The employer's obligation to take prompt corrective action requires (1) that temporary steps be taken to deal with the situation while the employer determines whether the complaint is justified and (2) that permanent remedial steps be implemented by the employer to prevent future harassment . . . ."  (*M.F. v. Pacific Pearl Hotel Management LLC* (2017) 16 Cal.App.5th 693, 701.)

We find that Beltran raised a triable issue of fact as to whether the efforts taken by HRH and PSH qualify as "immediate" and caused Beltran compensable damage.  Pineda, a manager, was promptly informed of the August 19 incident by Beltran, but did not report this incident for approximately three weeks, during the course of Shepard's investigation.  During this period, a reasonable finder of fact could conclude

that Beltran believed nothing would come of her complaint and that she would be subjected to continued harassment, leading to physical stress and emotional distress. This is sufficient to defeat summary adjudication on this claim.

The trial court's other reason for rejecting this cause of action was its conclusion that Beltran had not raised a triable issue of fact as to whether she had been subjected to sexual harassment. As we will discuss next, we thoroughly disagree and conclude the trial court applied the wrong standard in reaching this conclusion. Accordingly, summary adjudication should not have been granted as to the fourth cause of action.

## G. Fifth Cause of Action for Hostile Work Environment Sexual Harassment

### 1. Current Law of Sexual Harassment

It is an unlawful employment practice for "an employer . . . to harass an employee." (§ 12940, subd. (j)(1).) "The existence of a strong public policy against sexual harassment in the workplace is indisputable. The public policy on this point is well defined and clearly expressed in state and federal law." (*City of Richmond v. Service Employees Internat. Union, Local 1021* (2010) 189 Cal.App.4th 663, 671.) Under California law, an employer is strictly liable for harassing conduct of its agents and supervisors. (§12940, subd. (j)(1).)

"Sexual harassment consists of any unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. [Citation.] It usually arises in two contexts. 'Quid pro quo' harassment conditions an employee's continued enjoyment of job benefits on submission to the harassment. 'Hostile work environment' harassment has the purpose or effect of either interfering with the work performance of an employee, or creating an intimidating workplace." (*Rieger v. Arnold* (2002) 104 Cal.App.4th 451, 459.) FEHA is to be construed liberally to accomplish its purposes. (§ 12993.)

20

Sexual harassment law in California requires an employee to prove "severe or pervasive" harassment. (§ 12923.) Prior to 2019, this requirement was quite a high bar for plaintiffs to clear, even in the context of a motion for summary judgment. But section 12923, which went into effect on January 1, 2019, clarified existing law in numerous respects. One such clarification, codified in subdivision (b), stated that "[a] single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive work environment." ( § 12923, subd. (b).) The Legislature therefore explicitly rejected *Brooks v. City of San Mateo* (2000) 229 F.3d 917, 926 [holding that "If a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe"].)

Section 12923, subdivision (a), also clarified that a hostile work environment exists "when the harassing conduct sufficiently offends, humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being." The plaintiff is not required to show a decline in productivity, only "that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to 'make it more difficult to do the job.'" (See *Harris v. Forklift Systems* (1993) 510 U.S. 17, 25 (conc. opn. of Ginsburg, J.).)

Further, as pertinent here, section 12923, subdivision (e), states: "Harassment cases are rarely appropriate for disposition on summary judgment." (See *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 286.)

In response to section 12923, the Judicial Council of California revised its jury instructions on sexual harassment. The new instruction on the conduct that is considered sufficient to establish a harassment claim states: "'Severe or pervasive'

21

means conduct that alters the conditions of employment and creates a work environment that is hostile, intimidating, offensive, oppressive, or abusive. [¶] In determining whether the conduct was severe or pervasive, you should consider all the circumstances, including any or all of the following: [¶] (a) The nature of the conduct; [¶] (b) How often, and over what period of time, the conduct occurred; [¶] (c) The circumstances under which the conduct occurred; [¶] (d) Whether the conduct was physically threatening or humiliating. [¶] [Name of plaintiff] does not have to prove that [his/her/nonbinary pronoun] productivity has declined. It is sufficient to prove that a reasonable person who was subjected to the harassing conduct would find that the conduct so altered working conditions as to make it more difficult to do the job. [¶] [A single incident can be sufficiently severe or pervasive to constitute harassment.]" (CACI No. 2524.)

PSH, in a five-sentence argument, contends that section 12923 does not apply here because it was enacted after the alleged harassment occurred in this case. Section 12923, however, did not change the substantive law of sexual harassment, but addressed how the trial courts were to apply that law, particularly and specifically in the context of summary judgment. The new law went into effect on January 1, 2019, well before the court heard the instant motions for summary judgment in June 2021. Therefore, there is no issue of retrospective application.

Further, even if we were to treat this as a "retroactive" application of the law, "[a] statute has retrospective effect when it substantially changes the legal consequences of past events." But "a statute that merely *clarifies,* rather than changes, existing law does not operate retrospectively even if applied to transactions predating its enactment." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243.) The first line of section 12923 states that it "hereby declares [the Legislature's] intent with regard to application of the laws about harassment contained in this part." Accordingly, this statute, by its plain language, falls into the category of clarification rather than

22

substantive change. "Such a statute 'may be applied to transactions predating its enactment without being considered retroactive' because it 'is merely a statement of what the law has always been.'" (*In re Marriage of Fellows* (2006) 39 Cal.4th 179, 183.) Examined either way, section 12923 is applicable to this case.

The only published California case applying section 12923 reversed summary judgment in the employer's favor. (*Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, 582-583 [finding triable issues of fact as to whether harassment based on age and national origin was severe and pervasive].) Some federal courts have also weighed in and applied the new standard. "[W]hat Defendants fail to recognize is that even one instance of harassment can be sufficient. *See* . . . § 12923(b)." (*Doe v. Wells Fargo Bank, N.A.* (C.D.Cal., Aug. 19, 2019, No. CV 19-5586-GW-PLAx) 2019 WL 3942963, at p. *6 [rejecting claim of fraudulent joinder where there the only management action was a very lewd comment].) "Defendants . . . claim that even if [the alleged] conduct constituted harassment, it was 'neither severe nor pervasive as a matter of law.' [Citation.] However, under California law, even one instance of harassment can be sufficient" to establish a harassment claim under FEHA. (*Milner v. TBWA Worldwide, Inc.* (C.D.Cal., Oct. 30, 2019, No. CV-19-08174 DSF(AFMx) 2019 WL 5617757, at p. *4.)

### 2. Summary Adjudication Was Not Appropriate

The trial court relied heavily on case law decided before section 12923 was adopted. This failed to take into account several key principles, including the definition of a hostile work environment, the clarification that "[a] single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct . . . created an intimidating, hostile, or offensive

23

work environment,"[6] and the instruction that "[h]arassment cases are rarely appropriate for disposition on summary judgment." (§ 12923, subds. (a), (b), (e).)

Instead, the trial court relied on older cases that did not take these principles into account, such as *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, where the court concluded that three incidents of harassment over five weeks was not severe and pervasive, and *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609, which stated that "plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature." These cases are no longer good law when it comes to determining what conduct creates a hostile work environment in the context of a motion for summary judgment or adjudication. (§ 12923; CACI No. 2524.)

Applying the standards set forth in section 12923, we conclude PSH and HRH failed to meet their burden to demonstrate that no actionable sexual harassment occurred. There was evidence of multiple incidents of conduct over a period of months, including leering gestures, hand massages, and inappropriate questions, which culminated with the slapping or groping incident. This evidence is more than sufficient to raise a triable issue of fact as to whether "a reasonable person who was subjected to the harassing conduct would find that the conduct so altered working conditions as to make it more difficult to do the job." (CACI No. 2524.) Accordingly, summary adjudication should not have been granted as to Beltran's cause of action for sexual harassment.

*H. Sixth Cause of Action for Negligent Hiring, Retention, and Supervision*

To establish negligent hiring, retention, or supervision, "a plaintiff must show that a person in a supervisorial position over the actor had prior knowledge of the actor's propensity to do the bad act." (*Z.V. v. County of Riverside* (2015) 238 Cal.App.4th 889, 902.)

---

[6] We emphasize, however, that this is not a single incident case.

24

Beltran argues Shepherd's acts "attaches liability to HRH" and PSH. She asserts "Shepherd was aware of the numerous drinking and womanizing issues related to Rivera." The portions of the record cited in support of this contention are a portion Shepherd's report on her investigation and her handwritten notes during the investigation. This evidence shows no more than that Shepherd learned of Rivera's "womanizing" *during the investigation.* It does not support the contention that she knew of it before it was reported by security personnel in September.

Beltran also asserts that Shepherd was aware of Rivera's "drinking problem." She points to a portion of Shepherd's deposition where Shepherd denied concluding that Rivera was an alcoholic. She said: "It's tough to judge whether someone is an alcoholic or not, but he did enjoy having a drink usually with whoever he could find." Beltran's counsel did not inquire when Shepherd learned of this, or at least she does not cite to the portion of the record where Shepherd was asked and answered that question. She also claims Shepherd knew of a sexual relationship between Rivera and an employee, but again, the cited evidence does not state *when* Shepherd learned of this relationship.

Thus, Beltran's assertion that "Shepherd knew Rivera was dangerous to women and that his retention was imperiling female employees" is not supported by the evidence. Nor does her claim that Shepherd "look[ed] the other way." Whatever conclusions and recommendations were made by Shepherd, Rivera was terminated shortly thereafter by senior personnel. Shepherd was not the sole agent of HRH/PSH in this matter. As to negligent hiring, Beltran claims Rivera was hired with "no vetting whatsoever" but she has nothing to support this assertion other than Rivera's employment application, which is not proof of what vetting did or did not occur. She cites no other evidence on this point.

25

HRH and PSH met their burden to demonstrate judgment on this claim should be granted in their favor, and Beltran failed to raise a triable issue of fact. Accordingly, summary judgment was properly granted on this cause of action.

*I. Seventh, Thirteenth, and Fourteenth Causes of Action for Retaliation Under Labor Code Sections 98.6, 1102.5, and FEHA*

These three causes of action are factually duplicative of each other. Labor Code section 98.6, subdivision (a), prohibits retaliation for filing a complaint. Labor Code section 1102.5, subdivision (b), prohibits retaliation for disclosing information to a person with the authority to investigate a violation of law. Under FEHA, it is a violation "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).)

Under all three statutes, to state a claim for retaliation, "a plaintiff must show that (1) he engaged in a protected activity, (2) his employer subjected him to an adverse employment action, and (3) there is a causal link between the two." (*Moreno v. UtiliQuest, LLC* (9th Cir. 2022) 29 F.4th 567, 575;[7] *Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1380.)

To constitute an adverse employment action, "the retaliation must result in a substantial adverse change in the terms and conditions of the plaintiff's employment. A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient. Requiring an employee to prove a substantial adverse job effect 'guards against both "judicial micromanagement of business practices," [citation] and frivolous suits over insignificant slights.'" (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1455.)

---

[7] California courts often look to federal law when interpreting FEHA. (*Reno v. Baird* (1998) 18 Cal.4th 640, 647.)

"[T]he determination of what type of adverse treatment properly should be considered discrimination in the terms, conditions, or privileges of employment is not, by its nature, susceptible to a mathematically precise test, and the significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests of both the employer and the employee. Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of sections 12940(a) and 12940(h)." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1054-1055.) "An isolated incident, such as a delay in the delivery of a single paycheck, a failure to receive an overtime check or an early job change, does not constitute an adverse employment action." (*Jones v. Department of Corrections & Rehabilitation*, *supra*, 152 Cal.App.4th at p. 1381.)

The adverse actions alleged by Beltran, according to her complaint, were "forcing [her] to confront Rivera against her will," and "arrang[ing]" for "work shifts where she would come into contact with [Rivera]." Neither of these assertions are supported by the evidence. There is no evidence Beltran was "forced" to do anything with respect to the meeting with Rivera. As discussed above, she was not prevented from leaving at any point during the brief, open door meeting. Nor is there any evidence at all that anyone "arranged" shifts where she would come into contact with Rivera. The only related evidence was that Shepherd told Rivera to stay away from Beltran as much as possible during the investigation. Beltran testified that after the report, Rivera did not harass her again. None of this amounts to "a substantial adverse change in the terms and conditions of the plaintiff's employment." (*Akers v. County of San Diego*, *supra*, 95 Cal.App.4th at p. 1455.)

27

Beltran also claims that Shepherd's query about whether she was wearing her cocktail server uniform on the date of the incident with Rivera constituted retaliation. Even if we ascribe Beltran's meaning to this comment rather than Shepherd's stated intent, it falls into the category of "trivial adverse actions or conduct" that does not materially impair the conditions of employment or work performance. (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th 1028, 1054-1055.)

We therefore find that HRH and PSH met their burden to demonstrate that Beltran failed to demonstrate an adverse employment action. Beltran did not meet her burden to show a triable issue of material fact on this issue. Accordingly, summary adjudication was properly granted on these three causes of action.

*J. Eighth Cause of Action for Gender Discrimination*

Beltran's alleged claim of discrimination is that she was subject to harassment and retaliation by Shepherd and Rivera because she is a woman. But, as in her retaliation claims, an element of a prima facie case for discrimination is an adverse employment action. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 356.)

"[T]he primary difference between discrimination claims and harassment claims is that discrimination claims 'address[] only *explicit* changes in the "terms, conditions, or privileges of employment" [citation]; that is, changes involving some *official action taken by the employer*.' [Citation.] 'In the case of an institutional or corporate employer, the *institution or corporation itself* must have taken some official action with respect to the employee, such as hiring, firing, failing to promote, adverse job assignment, significant change in compensation or benefits, or official disciplinary action.'" (*Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 931-932.)

There are times when discrimination and harassment cases overlap. "In a case where a supervisor threatens to deny an employee a promotion unless the employee

28

provides the supervisor with sexual favors and the threat is realized after the employee refuses, the aggrieved employee can bring suit against both the employer and the supervisor.  The cause of action against the employer may take the form of a section 12940, subdivision (a) discrimination claim, a subdivision (j) harassment claim, or both." (*Pollock v. Tri-Modal Distribution Services, Inc.*, *supra*, 11 Cal.5th at p. 932.)  But that is not this case.  For the same reasons we discussed *ante* with respect to Beltran's retaliation claims, she has not raised any triable issue of material fact as to gender discrimination, and summary adjudication on this claim was properly granted.

*K.  Ninth Cause of Action for Intentional Infliction of Emotional Distress*

The only argument Beltran offers in her opening brief on this point is that HRH and PSH should be vicariously liable for Rivera's alleged intentional infliction of emotional distress.  She does not argue that any acts the HRH or PSH committed through their agents constituted intentional infliction of emotional distress, and accordingly she has forfeited any such argument.

"Under the rule of respondeat superior, an employer is vicariously liable for the torts of its employees committed within the scope of employment.  [Citation.]  An employer may be vicariously liable for willful, malicious, even criminal acts, of an employee that are deemed to be committed within the scope of employment, even though the employer has not authorized such acts."  (*Samantha B. v. Aurora Vista Del Mar, LLC* (2022) 77 Cal.App.5th 85, 107.)

The analysis to determine course and scope of employment involves considering whether the conduct was engendered by the work, whether the conduct was foreseeable, and whether the policy goals of vicarious liability would be served.  (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 299.)  With respect to the first element, a sexual tort will be considered to be within the scope of employment if

29

"its motivating emotions were fairly attributable to work-related events or conditions." (*Id.* at p. 301.) In *Lisa M.,* the work involved was performing ultrasounds.

The work involved here is significantly different, as it involved the operation of a nightclub. Rivera was known for drinking and dancing in the club while he was on duty – indeed, his drinking while in the club was the ostensible reason he was fired. A nightclub is a significantly different atmosphere than a procedure room in a hospital, and we cannot say there are no material issues of fact as to whether the "motivating emotions" of Rivera's acts were not engendered by "work-related events or conditions," or that his conduct was not foreseeable. Accordingly, we find there were material issues of fact as to whether Rivera was acting within the course and scope of his employment that preclude summary adjudication.

Alternatively, an employer may be liable for an employee's act where the employer subsequently ratifies the originally unauthorized tort. (*C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094, 1110.) The failure to investigate or respond to charges that an employee has committed an intentional tort or the failure to discharge the employee may be evidence of ratification, which is generally a question of fact. (*Ibid.*) Although we doubt this issue would ultimately be decided in Beltran's favor, as Pineda's failure to promptly report Beltran's complaint appears to be entirely inadvertent, we cannot say there is no triable issue of fact as to ratification. Summary adjudication, therefore, should not have been granted as to the intentional infliction of emotional distress cause of action.

L. *Tenet Cause of Action for Negligence*

At common law, "[t]he elements of a cause of action for negligence are duty, breach, causation, and damages." (*Melton v. Boustred*, *supra*, 183 Cal.App.4th at p. 529.) Whether a duty exists is a question of law for the court, which we independently review. (*Doe v. Lawndale Elementary School Dist.* (2021) 72 Cal.App.5th 113, 125.) "If

there is no duty, there can be no liability, no matter how easily one may have been able to prevent injury to another." (*Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 150.)

In general, there exists "no duty to protect others from the conduct of third parties. The 'special relationship' doctrine is an exception to this general rule." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 627.) "[A] duty to control may arise if the defendant has a special relationship with the foreseeably dangerous person that entails an ability to control that person's conduct. [Citation.] . . . Similarly, a duty to warn or protect may be found if the defendant has a special relationship with the potential victim that gives the victim a right to expect protection." (*Id.* at p. 619.) "The relationships between common carriers and their passengers, or innkeepers and their guests, are classic examples of this type of special relationship." (*Id.* at p. 620.) The court cited to the Restatement Third of Torts, which includes the employer/employee relationship as a special one when "employees who, while at work, are: [¶] (a) in imminent danger; or [¶] (b) injured or ill and thereby rendered helpless . . . ." (Rest.3d Torts, Physical & Emotional Harm (2012) § 40.)

Beltran did not allege a special relationship between herself and any defendant in her negligence cause of action in her complaint, nor does she argue one on appeal. Her complaint merely alleged defendants "owed a duty of care" to her. "[T]he pleadings 'delimit the scope of the issues' to be determined and '[t]he complaint measures the materiality of the facts tendered in a defendant's challenge to the plaintiff's cause of action.'" (*Lackner v. North* (2006) 135 Cal.App.4th 1188, 1201-1202, fn. 5.) Beltran's failure to plead a special relationship, and to argue material facts exist in opposition to the motions for summary judgment, are fatal to this claim.

Even if we could look past Beltran's failure to plead and argue this issue, we would find that she cannot establish, as a matter of law, that she was in "imminent danger." Even presuming "danger" includes sexual harassment, there are no facts to support her contention that Rivera had a "history of using his authority to facilitate

31

sexually inappropriate work-place behavior with vulnerable young female staff under his charge." Beltran points to no evidence that anyone knew of Rivera's alleged history before security staff informed Shepherd to the contrary. The only evidence is that the allegations were reported, Shepherd conducted an investigation, and the executives at a higher level ultimately terminated Rivera's employment.

Here, the complaint does not allege a special relationship, and without one, Beltran cannot maintain her cause of action for common law negligence. HRH and PSH are entitled to summary adjudication as a matter of law because she did not adequately plead negligence, much less raise a triable issue of material fact. Summary adjudication was properly granted.

*M. Eleventh Cause of Action for Unfair Business Practices*

The UCL is codified in Business and Professions Code section 17200 et seq. The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." "Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition — acts or practices which are unlawful, or unfair, or fraudulent." (*Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647.) The complaint identified two laws HRH and PSH allegedly violated – retaliation under Labor Code section 98.6, and the existence of a hostile work environment under FEHA. Beltran also alleged defendants' conduct was "unfair" under the UCL, presumably for the same reasons. As discussed *ante,* the Labor Code violation has no merit. The hostile work environment claim does have merit for the reasons discussed above.

A plaintiff cannot seek money damages under the UCL. "While the scope of conduct covered by the UCL is broad, its remedies are limited. [Citation.] UCL action is equitable in nature; damages cannot be recovered. [Citation.] . . . We have stated that under the UCL, '[p]revailing plaintiffs are generally limited to injunctive relief

32

and restitution.'" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144.) Given that Beltran has left the Hotel and is no longer an employee, any request for injunctive relief is moot.

Beltran's complaint alleged that she seeks "restitution and the disgorgement of all earnings, profits, compensation, benefits, and other ill-gotten gains obtained by DEFENDANTS' conduct in violation of Cal. Bus. & Prof. Code §17200 *et seq*." We have grave doubts that any plaintiff could identify how restitution or disgorgement could possibly be calculated in this case, and further doubts as to the wisdom of allowing a UCL claim to proceed in this context.

But we cannot deny there is a deluge of case law discussing the broad scope of the UCL and the fact that it is not limited to the realm of business competition, despite its stated purpose of protecting consumers and competitors. (See, e.g., *Abbott Laboratories v. Superior Court* (2020) 9 Cal.5th 642, 651; *Gray v. Dignity Health* (2021) 70 Cal.App.5th 225, 236.) The reason the trial court granted summary adjudication, and the only argument defendants advance on appeal, is that the UCL claim was derivative of the other causes of action, all of which had been disposed of. That is no longer true. Accordingly, we find that summary adjudication as to this cause of action was improperly granted.

## N. *Twelfth Cause of Action for Constructive Discharge*

"In order to establish a constructive discharge, an employee must plead and prove . . . that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1251.) "Standing alone, constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation

into a firing. Even after establishing *constructive* discharge, an employee must independently prove a breach of contract or tort in connection with employment termination in order to obtain damages for *wrongful discharge*." (*Ibid.*) Despite pleading 15 causes of action, none of them is for wrongful discharge. Accordingly, even if Beltran could establish constructive discharge, it would do her no good without a wrongful termination cause of action.

Even if pleading constructive discharge alone was sufficient, Beltran has not established it here based on the undisputed facts. It was undisputed that at the time of her resignation, the harassment had stopped and Rivera was no longer employed by HRH or PSH. Further, no harassment occurred after Shepherd's investigation began. Regardless of how Beltran personally felt about Shepherd or human resources, a reasonable employee in Beltran's position would not have found the working conditions intolerable. Further, the evidence was not that she resigned because of the working conditions, but because she had found a new job, which she began shortly after leaving the Hotel. Accordingly, as a matter of law, summary adjudication was appropriately granted as to the constructive discharge cause of action.

## O. Fifteenth Cause of Action for False Imprisonment

As previously discussed, a claim for false imprisonment requires nonconsensual confinement by defendant with the intent to confine, without lawful privilege to do so, for an appreciable length of time. (*Scofield v. Critical Air Medicine, Inc.*, *supra*, 45 Cal.App.4th at p. 1001.) This refers to the meeting in Shepherd's office between Beltran, Shepherd, or Rivera. We have already disposed of this claim as to Shepherd, and as she did not commit false imprisonment, there is no vicarious liability on the part of PSH or HRH. That leaves Rivera's conduct only. Beltran has failed to establish a triable fact here as to either the first or third elements of this claim. She has no evidence, even circumstantial evidence, of Rivera's intent to confine her. Nor does

she raise a triable issue of fact that she was confined for an appreciable length of time. The allegation in the complaint that she was barred from moving "physically and through the threat of physical force" is simply unsupported by any evidence whatsoever. Beltran has failed to establish a triable issue of fact.


# III

## DISPOSITION

The judgment is affirmed as to Shepherd in its entirety.

As to PSH and HRH, summary adjudication is reversed and remanded as to the fourth cause of action for failure to prevent harassment, the fifth cause of action for hostile work environment sexual harassment under FEHA, the ninth cause of action for intentional infliction of emotional distress (vicarious liability for Rivera's acts), and the eleventh cause of action for violation of the UCL. Summary adjudication is affirmed as to the remaining causes of action.

Beltran is entitled to her costs on appeal from PSH and HRH. Shepherd is entitled to her costs on appeal from Beltran.



MOORE, ACTING P. J.

WE CONCUR:



SANCHEZ, J.



DELANEY, J.



35